PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MICHAEL DWAYNE DURHAM,

        *Plaintiff-Appellant,*

        v.

DAVID L. HORNER, Wise County
Sheriff's Deputy and Member of
the Regional Drug Task Force,
individually, and in his official
capacity as a Wise County
Sheriff's Deputy and Regional
Drug Task Force Member,

        *Defendant-Appellee,*

        and

JOHN DOES,

        *Defendants.*

No. 11-1022

Appeal from the United States District Court
for the Western District of Virginia, at Big Stone Gap.
James P. Jones, District Judge.
(2:09-cv-00012-jpj-pms)

Argued: May 15, 2012

Decided: August 8, 2012

Before TRAXLER, Chief Judge, and KING and WYNN,
Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in which Chief Judge Traxler joined. Judge Wynn wrote a dissenting opinion.

---

**COUNSEL**

Charles Adam Kinser, MONTGOMERY KINSER LAW OFFICES, Jonesville, Virginia, for Appellant. Henry Keuling-Stout, KEULING-STOUT, PC, Big Stone Gap, Virginia, for Appellee.

---

**OPINION**

KING, Circuit Judge:

In a case of mistaken identity, Michael Dwayne Durham was charged and jailed in southwest Virginia for more than three months before the prosecutor realized and rectified the error. As a result, Durham initiated this civil action in the Western District of Virginia against, inter alia, officer David L. Horner, alleging a Fourth Amendment claim under 42 U.S.C. § 1983, plus a state law claim for malicious prosecution.[1] The district court awarded summary judgment to Horner on the basis of qualified immunity, and Durham appeals. *See Durham v. Horner*, No. 2:09-cv-00012 (W.D. Va. Dec. 7, 2010) (the "Opinion").[2] As explained below, we affirm.

---

[1]Durham also named as defendants the Commonwealth's Attorney of Wise County and its high Sheriff. He has not appealed the district court's judgment of dismissal in favor of those defendants.

[2]The district court's unpublished Opinion is found at J.A. 357-66. (Citations herein to "J.A.___" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

## I.

In 2005, Horner was a police officer in Big Stone Gap, Virginia, and a member of the Regional Drug Task Force.[3] In performing his Task Force duties, Horner arranged for three controlled drug buys in late 2005 through a confidential informant (the "CI").[4] On November 29, 2005, about an hour prior to the first drug buy, Horner received a telephone call from the CI, who disclosed his plan to purchase illegal drugs from a man named "Michael Dwayne Durham." *See* Opinion 2; J.A. 180. The CI described the drug dealer as an "old man" who drove a Jeep with a stolen Tennessee license plate, number unknown. *See* J.A. 330-31, 334-35. Horner relayed the name Michael Dwayne Durham to the Task Force office which, in turn, provided a social security number and a Big Stone Gap post office address associated with that name. Although the Task Force generally sought photographs of suspects, it did not secure a photo of the drug dealer.[5]

Horner used Accurint, an internet investigative tool available to law enforcement agencies, to query the name Michael Dwayne Durham, inputting the social security number obtained by the Task Force. The Accurint report listed Durham's age as forty-five and his physical description, from Tennessee DMV records, as 6′7″, 225 pounds, with brown hair and hazel eyes. The report reflected the Big Stone Gap

---

[3]For purposes of our review of the district court's summary judgment award, we recite the facts in the light most favorable to Durham, as the nonmoving party. *See Buckley v. Mukasey*, 538 F.3d 306, 310 n.4 (4th Cir. 2008).

[4]By its Opinion, the district court observed that "[t]here were apparently more than one CI involved in some fashion, although the CI Tracking Sheets prepared by Horner at the time indicated one and the same CI for each drug purchase." Opinion 2 n.1.

[5]After Horner became aware of this civil action, he conducted a review of the case to determine what had happened. He eventually showed the CI a photograph of a "Michael *David* Durham," whom the CI identified as the person who sold him drugs. *See* J.A. 274-75 (emphasis added).

address where Durham received mail from 1982 to 1999. Accurint identified other addresses for Durham, including Memphis, Tennessee, between 1982 and 1999, Smithfield, Virginia, in 1992 and between 1994 and 2002, and a "current" address: Horn Lake, Mississippi, where he had moved in September 1999. According to Accurint, Durham owned a Jaguar, and he had been arrested once for driving while intoxicated. The report cautioned that "[b]efore relying on any data this system supplies, it should be independently verified." J.A. 228.

After obtaining the Accurint report, Horner checked VCIN, another internet resource for law enforcement agencies, where he acquired Durham's criminal history record in Mississippi. That record, from the state Department of Public Safety, described Durham as 6′1″ and 197 pounds, with state convictions for possession of drug paraphernalia in February 2003, and for public drunkenness and possession of drug paraphernalia in July 2003.

With respect to the CI's first drug buy, Horner completed a "CSI Tracking Sheet," identifying the target as "Mike Durham" with the Big Stone Gap address. J.A. 222. He also completed a laboratory examination request for eight yellow pills (believed to be Percocet) purchased from "Durham, Michael Dwayne" on November 29, 2005. *Id.* at 223. Horner submitted the CSI Tracking Sheet and the laboratory request to the Task Force for processing.

The CI's two other drug buys occurred in Wise County on December 3 and 16, 2005. On both occasions, the CI identified the drug dealer as Michael Dwayne Durham. The CI purchased eight yellow pills in the second drug buy and two packs of white powder (believed to be methamphetamine) during the third. Officer Horner submitted a CSI Tracking Sheet and laboratory request to the Task Force for each of the latter two drug transactions. When the laboratory results confirmed that the CI had, in fact, purchased drugs in each of the

three incidents, Horner "told [the Task Force] to go ahead and indict [Durham]." J.A. 331. From that point on, Horner had no involvement in Durham's arrest and prosecution.

On May 31, 2006, Task Force Agent Larry Mullins testified before the grand jury in Wise County. An excerpt of those grand jury proceedings shows the following exchange:

> LARRY MULLINS: Next one will be on Michael Dwayne Durham, D-U-R-H-A-M.
>
> THE JUROR: I have two on him.
>
> LARRY MULLINS: Should be an offense day of 12/16/05.
>
> THE JUROR: I have three on him.
>
> LARRY MULLINS: On 12/16/05 informant contacted agent David Horner and advised him he made arrangements to purchase Methamphetamine from Michael Durham. Informant met with Agent Horner where they were searched for no contraband found. Informant was provided with a transmitter recording device and money to make the purchase.
>
> Informant met with suspect Michael Durham and purchased one gram of Methamphetamine for $100. Informant met back with Agent Horner turning the narcotic over to him where they were searched again with no contraband found.
>
> THE JUROR: Now when you say one unit is that –-

J.A. 284. On May 31, 2006, the grand jury returned three indictments against Michael Dwayne Durham — relating to the three drug transactions with the CI — charging him with felony drug distribution offenses. *See id.* 207, 216, 219. As a

result, the circuit court issued three separate bench warrants directing "Sgt. D. Horner, or Any Other Authorized Law Enforcement Officer" to arrest "Michael Dwayne Durham." *See id.* at 208, 217, 220.

Nearly six months later, in November 2006, Durham, who was living in Memphis, Tennessee, received a letter from the Social Security Administration notifying him that his disability benefits would be terminated due to an outstanding arrest warrant in Wise County, Virginia. As a result, David Byard, one of Durham's friends, contacted the Wise County Sheriff's Department to inquire about the warrant and explain that Durham had not lived in Virginia for more than ten years. Byard was told that Durham should surrender to the authorities in Memphis, and "they would straighten it out." *See* J.A. 242. In December 2006, Durham surrendered to the Memphis authorities, waived extradition, and was transported to the Southwest Virginia Regional Jail at Duffield, Virginia.

On December 15, 2006, Durham appeared before a Virginia magistrate and informed the court, inter alia, that "they've got the wrong person" because he had never sold drugs. *See* J.A. 248. The magistrate responded, "[W]ell, we've got your address where you lived in Big Stone Gap, Virginia." *Id.* Durham replied, "[Y]es, sir, that's right [but] what does that prove[?]" *Id.* Although the court fixed Durham's bail at "$9,000 secured," he was unable to post bond. *See id.* at 212. On December 18, 2006, Durham appeared before the Wise County circuit judge and the court appointed counsel. Durham's lawyer, however, waited for two months, until February 2007, to contact his client. Meanwhile, Durham did not raise any mistaken identity issues with the Regional Jail authorities because, according to Durham, "they wouldn't have believed [him]." *See id.* at 247. When Durham's lawyer finally talked to his client, Durham apparently explained the situation. Durham remained in the Regional Jail for another month, however, until March 20, 2007, when his lawyer presented Durham's cell phone records to the Com-

monwealth's Attorney and argued that the wrong person had been indicted and arrested. The prosecutor agreed with the defense lawyer and dismissed the three indictments against Durham later that same day.

Nearly two years later, on March 17, 2009, Durham initiated this federal court civil action against the Commonwealth's Attorney, the Sheriff, and Horner. The only alleged claims to survive the initial round of dispositive motions in the district court were Durham's § 1983 claim and a state law malicious prosecution claim against Horner, each predicated on an asserted violation of his Fourth Amendment right to be free from unreasonable seizure. Horner moved for summary judgment on the basis of qualified immunity, and, on December 7, 2010, the district court granted judgment in his favor. In rejecting Durham's attempts to show factual disputes concerning Horner's investigation and the resulting prosecution, the court explained that, at bottom,

> [q]ualified immunity does not protect only those police officers who are never mistaken. To have probable cause does not mean to have proof sufficient to convict. It is clear from the present record that . . . Horner acted in good faith in accord with the information available to him. That his investigation led to the very unfortunate circumstance portrayed in this case is highly regrettable, but under the law, these facts do not permit the officer to be subject to a trial for money damages.

Opinion 8-9. Durham has timely appealed from the district court's qualified immunity ruling, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review de novo an award of summary judgment on the basis of qualified immunity. *See Lefemine v. Wideman*, 672

F.3d 292, 297 (4th Cir. 2012). Summary judgment is proper "only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party," there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law. *See Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011).

III.

Durham contends on appeal that Horner was not entitled to qualified immunity because he relied on and utilized unverified information to set "forth a chain of events that would lead to the indictment and arrest of the wrong individual." Br. of Appellant 10. Durham emphasizes that Horner knew from the Accurint report that Durham had not had a Big Stone Gap address since 1999; that Horner never obtained the Tennessee license number to confirm whether the Jeep belonged to Durham; that Horner had not secured a photograph of Durham to show the CI and confirm the drug dealer's identity; that Horner believed the dealer was approximately sixty years old, and not, like Durham, in his mid-forties; and that Horner admitted by deposition that he was not a hundred percent certain that he had the correct Michael Durham. Accordingly, Durham maintains that "Horner's actions were plainly incompetent," arguing that "whether or not Horner acted reasonably is a jury question." *Id.* at 11.

As we have recognized, "[q]ualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011). Hence, our qualified immunity defense involves a "two-step" inquiry, asking "first whether a constitutional violation occurred and second whether the right violated was clearly established." *Id.* (internal quotation marks omitted).

Put succinctly, Durham's "malicious prosecution" claim fails the first step of the qualified immunity inquiry.[6] Although "it is not entirely clear whether [there is] a separate constitutional right to be free from malicious prosecution, if there is such a right, the plaintiff must demonstrate both an unreasonable seizure and a favorable termination of the criminal proceeding flowing from the seizure." *Snider v. Seung Lee*, 584 F.3d 193, 199 (4th Cir. 2009) (citations omitted). Thus, what has been inartfully "termed a 'malicious prosecution' claim . . . is simply a claim founded on a Fourth Amendment seizure that incorporates the elements of the analogous common law tort of malicious prosecution." *Id.* (internal quotation marks omitted). More specifically, "we have required that [1] the defendant have 'seized plaintiff pursuant to legal process that was not supported by probable cause and [2] that the criminal proceedings have terminated in plaintiff's favor.'" *Burrell v. Virginia*, 395 F.3d 508, 514 (4th Cir. 2005) (quoting *Brooks v. City of Winston-Salem*, 85 F.3d 178, 183-84 (4th Cir. 1996)) (alterations and emphasis omitted).

Durham is unable to establish a constitutional violation because, although the underlying criminal proceedings were terminated in his favor, the prosecution was plainly supported by probable cause, as conclusively established by the three indictments. It has long since been settled by the Supreme Court that "an indictment, 'fair upon its face,' returned by a 'properly constituted grand jury,' conclusively determines the existence of probable cause." *Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975) (internal quotation marks omitted); *Costello v. United States*, 350 U.S. 359, 363 (1956) (recognizing that grand jury "indictment . . . valid on its face, is enough to call for trial of the charge on the merits"). Notwithstanding the conclusive effect of the indictments, our precedents instruct

---

[6]Consistent with the Supreme Court's decision in *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), we are entitled to evaluate the two qualified immunity inquiries in either order. Because we can dispose of this case on the first step, we turn immediately to it.

that "a grand jury's decision to indict . . . will [not] shield a police officer who deliberately supplied misleading information that influenced the decision." *See, e.g.*, *Goodwin v. Metts*, 885 F.2d 157, 162 (4th Cir. 1989) (quoting favorably *Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988)), *overruled in part by*, *Albright v. Oliver*, 510 U.S. 266 (1994); *see also Miller v. Prince George's Cnty., Md.*, 475 F.3d 621, 632 (4th Cir. 2007) (observing that "the Constitution did not permit a police officer . . . with reckless disregard for the truth, to make material misrepresentations or omissions to seek [an arrest] warrant that would otherwise be without probable cause").

The primary problem that Durham faces in this proceeding is that he was indicted by a Wise County grand jury before which Horner did not even testify. Agent Mullins was the only law enforcement officer to testify before the grand jury and, in that circumstance, Horner could hardly have been the instrument of its misapprehension. Indeed, we have no basis for concluding that Horner tainted the grand jury process, because, other than the excerpt from Agent Mullins's testimony (referenced above), the record does not disclose the evidence that the grand jury heard and considered. Nor has Durham put forward any evidence to show that Horner acted maliciously or conspired with Agent Mullins to mislead the grand jury.[7] As a result, the grand jury's probable cause determinations and its three indictments were the proximate cause

---

[7]We recognize that malice is not an essential element of a Fourth Amendment claim for unreasonable seizure because "the reasonableness of a seizure . . . should be analyzed objectively." *Burrell*, 395 F.3d at 514 n.5. Of course, the determination of probable cause inherent in any indictment — typically rendering perforce any seizure of the named defendant objectively reasonable — can be legitimately questioned in the presence of facts indicating that a law enforcement officer has maliciously tainted the grand jury process. Other than a bald allegation of a lack of probable cause, however, there is no allegation or evidence that any of Horner's actions contributing to Durham's indictments and arrest were motivated by either malice or ill will.

of Durham's arrest and detention, which by operation of law constituted a reasonable seizure. *Cf. Brooks*, 85 F.3d at 184 & n.7 (recognizing that, where untainted facts support officer's assessment of probable cause, seizure "rendered reasonable by virtue of a probable cause determination by a neutral and detached magistrate . . . is reasonable" and "break[s] the causal chain between the application for the warrant and the improvident arrest"); *see also Jennings v. Patton*, 644 F.3d 297, 301 (5th Cir. 2011) (upholding award of qualified immunity to public official, despite assertion that he tainted grand jury process, because, inter alia, official did not testify before grand jury); *Anthony v. Baker*, 767 F.2d 657, 666 (10th Cir. 1985) (affirming verdict in favor of officer who assisted in investigation but did not testify before grand jury as there was no evidence that he "conspired . . . to taint the probable cause determinations").

Even if we were disposed to look behind the indictments in this case, we would agree with the district court that Horner was not plainly incompetent in assessing the probable cause issue. As we have recognized, "[f]or probable cause to exist, there need only be enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed; evidence sufficient to convict is not required." *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002) (analyzing § 1983 false arrest claim under Fourth Amendment's unreasonable seizure framework). Put simply, there was ample evidence for a reasonable law enforcement officer to believe that Durham was involved in the three drug transactions — namely, the CI had on three occasions identified the drug dealer as Michael Dwayne Durham; Durham had a Big Stone Gap address; the drug dealer had a vehicle with Tennessee license plates; Durham had a Tennessee driver's license; and Durham's criminal history included two drug-related convictions. Contrary to Durham's assertions, Horner was "not required to exhaust every potentially exculpatory lead or resolve every doubt about [Durham's] guilt before probable cause [was] established." *See Miller*, 475 F.3d at 630 (internal

quotation marks omitted). Nevertheless, even if the existence of probable cause were a close question, the "qualified immunity standard gives ample room for mistaken judgments." *Henry*, 652 F.3d at 534 (internal quotation marks omitted). Indeed, qualified immunity protects public officials from "bad guesses in gray areas." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

In sum, Durham is unable to establish that his seizure was "pursuant to legal process that was not supported by probable cause," *Burrell*, 395 F.3d at 514, and he has not shown the essential constitutional violation underlying a § 1983 claim.[8] Because there was, as a matter of law, probable cause for Durham's arrest and detention, his state law malicious prosecution claim fails as well. *See Lewis v. Kei*, 708 S.E.2d 884, 889-90 (Va. 2011) (affirming dismissal of state law malicious prosecution claim where plaintiff failed to allege essential element of lack of probable cause).

## IV.

Pursuant to the foregoing, we affirm the judgment of the district court.

*AFFIRMED*

WYNN, Circuit Judge, dissenting:

When viewed in the light most favorable to the nonmoving party, the evidence in this case could support a finding that, as a result of Officer Horner's failure to perform his duties competently and thoroughly, Michael Dwayne Durham ("Durham") was wrongfully indicted, arrested, and incarcer-

---

[8]Having concluded that Durham has no "viable § 1983 claim, we need not determine whether any rights [he] asserted were 'clearly established' for purposes of qualified immunity." *See Lambert v. Williams*, 223 F.3d 257, 263 n.5 (4th Cir. 2000).

ated. Because I would find that Officer Horner's mistaken conclusion regarding Durham's identity cannot be deemed objectively reasonable as a matter of law-and that, by turn, he is therefore not entitled to qualified immunity as a matter of law—I must respectfully dissent.

## I.

The majority opinion would grant Officer Horner qualified immunity on the basis that a grand jury "indictment, fair upon its face, returned by a properly constituted grand jury, conclusively determines the existence of probable cause."[1] *Ante* at 9 (quotation marks omitted). According to the majority opinion, because of this indictment Durham is unable to establish that "a constitutional violation" occurred. *See id.* ("[T]he prosecution was plainly supported by probable cause, as conclusively established by three indictments."). Thus, for the majority, the indictment breaks the causal chain between Officer Horner's alleged incompetence and Durham's injury. *Id.* at 11.

However, the Supreme Court has rejected a similar argument:

> § 1983 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions. Since the common law recognized the causal link between the submission of a complaint and an ensuing arrest, we read § 1983 as recognizing the same causal link.

*Malley v. Briggs*, 475 U.S. 335, 345 n.7 (1986) (citation omitted). In applying *Malley*, we have held that "[a]n officer can-

---

[1] To support this proposition, the majority relies on *Costello v. United States*, 350 U.S. 359, 363 (1956). However, that case dealt with the Fifth Amendment's requirement for a grand jury, not the Fourth Amendment's right to be free from unreasonable searches and seizures and its probable cause requirement, which are at issue here.

not invoke qualified immunity where he 'did not avail himself of readily available information that would have clarified matters to the point that [the criminal charges] would have been flatly ruled out as factually unsupportable.'" *Goodwin v. Metts*, 885 F.2d 157, 164 (4th Cir. 1989) (quoting *Sevigny v. Dicksey*, 846 F.2d 953, 957-58 (4th Cir. 1988)), *overruled in part by*, *Albright v. Oliver*, 510 U.S. 266 (1994). This limitation on qualified immunity comports with the Supreme Court's admonition in *Malley* that officers who are "plainly incompetent or those who knowingly violate the law" should not be shielded from liability. 475 U.S. at 341. Thus, a malicious or incompetent police officer who applies for an arrest warrant will not be protected from liability by qualified immunity. *See Goodwin*, 885 F.2d at 162. Likewise, such an officer will not be shielded from liability by a grand jury's indictment.[2] *See also Miller v. Prince George's Cnty., M.D.*, 475 F.3d 621, 632 (4th Cir. 2007).

## II.

Nonetheless, the majority determines, *as a matter of law*, that qualified immunity shields Officer Horner from liability regarding the wrongful arrest and confinement of Durham, based on a standard of "deliberately suppl[ying] misleading information that influenced the [grand jury's] decision" to indict. *Goodwin*, 885 F.2d at 162. However, *Goodwin* also states that an officer is *not* shielded from liability if "a reasonably well-trained officer in [his] position would have known that his affidavit [for a warrant] failed to establish probable cause and that he should not have applied for the warrant." *Id.* (citation omitted). As the Supreme Court has noted, "objec-

---

[2]The majority opinion relies on *Jennings v. Patton*, 644 F.3d 297 (5th Cir. 2011), for the proposition that the failure to testify before the grand jury should afford Officer Horner an additional layer of protection. *Ante* at 11. However, in *Jennings*, the official given qualified immunity was not responsible for the preparation or presentation of the warrant application. Here, by contrast, Officer Horner prepared the evidence brought before the grand jury.

tive reasonableness" is the correct "standard . . . [that] defines the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest." *Malley*, 475 U.S. at 344; *see also Miller*, 475 F.3d at 632 ("[A] police officer who recklessly . . . omits material information from[] a search warrant affidavit cannot be said to have acted in an objectively reasonable manner, and the shield of qualified immunity is lost." (citation and quotation marks omitted)). In this case, a genuine dispute of fact remains regarding whether Officer Horner's mistakes were objectively reasonable. As such, this case cannot and should not be decided as a matter of law.

On a motion for summary judgment, the evidence and all reasonable inferences drawn from it should be viewed in the light most favorable to the nonmoving party, Durham. *See Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011). When viewed in this light, the evidence indicates that Officer Horner erroneously relied on a report from Accurint, a system which conspicuously warns that the information given needs corroboration.[3] That report showed at most a tenuous link between Officer Horner's target and Durham's Social Security number and former post office box.

Officer Horner's unreasonable reliance and alleged failure to perform his duties thoroughly and competently set in motion a chain of events that ended with Durham's wrongful arrest and imprisonment for over ninety days. Regardless of the performance of court-appointed counsel, the undeniable truth remains that, but for Officer Horner's actions, Durham

---

[3] The Accurint report begins with the following disclaimer:

> The Public Records and commercially available data sources used on reports have errors. Data is sometimes entered poorly, processed incorrectly and is generally not free from defect. This system should not be relied on as definitely accurate. Before relying on any data this system supplies, it should be independently verified.

would never have been arrested and incarcerated. If the investigative officer cannot be held accountable for his recklessness or incompetence, then where is an innocent man to turn?

The record shows that the confidential "informant contacted [Officer] Horner and advised him [that] he made arrangements to purchase Methamphet[a]mine from Michael Durham."[4] J.A. 284. Officer Horner put that name into the Accurint system and relied on the results of the resulting Accurint report, notwithstanding his knowledge of facts that directly undermined and contradicted the accuracy of the Accurint report.

For example, Officer Horner knew that his target was driving a Jeep with a stolen Tennessee license plate; however, Durham had a Mississippi driver's license. Additionally, based on information from the confidential informant, Officer Horner believed his target was approximately sixty years old, but Officer Horner possessed a copy of the law enforcement report that showed Durham was only forty-nine years old. Moreover, the controlled drug buys under investigation took place in Wise County, Virginia, but Officer Horner knew that Durham had not lived there since 1999 and was currently living over 500 miles away, in Horn Lake, Mississippi. Indeed, Officer Horner admitted that he harbored doubts as to whether the Accurint report identified the correct target.

After Durham learned of the arrest warrant, David Byard, a friend of Durham's, called the Wise County Sheriff's Department on Durham's behalf and explained that Durham

---

[4]The majority determines that the confidential informant gave Officer Horner the name "Michael Dwayne Durham". *Ante* at 3, 5, 11; J.A. 73, 180. However, the record reflects that the confidential informant may have simply identified "Michael Durham" as the target suspect. J.A. 222, 284. Therefore, it appears that there is a genuine dispute of material fact regarding whether the confidential informant identified the target suspect as "Michael Durham" or "Michael Dwayne Durham." Such a disputed fact should be decided by a jury.

could not have committed this crime and had not lived in Virginia for over ten years. Byard was informed that Durham should turn himself in and that the matter would be straightened out.

In December 2006, Durham surrendered to Memphis authorities, waived extradition, and was transported to Virginia. Upon arrival, Durham told a magistrate that he had been wrongly indicted and that he had never sold drugs. After Durham's arrest no picture was ever sent to the confidential informant for verification, and no action was taken to verify that the right person was arrested. J.A. 148-50. However, when a new suspect, Michael *David* Durham, was found, the investigative officer quickly sent a photograph to the confidential informant, who identified him as the perpetrator. J.A. 167-68.

When viewed in the light most favorable to Durham, these facts could support a finding that Officer Horner's actions and mistakes were not objectively reasonable. *See Goodwin*, 885 F.2d at 164 ("An officer cannot invoke qualified immunity where he did not avail himself of readily available information that would have clarified matters to the point that [the criminal charges] would have been flatly ruled out as factually unsupportable." (quotation marks omitted)); *United States v. Reaves*, 512 F.3d 123, 126 (4th Cir. 2008) ("When the police rely on an anonymous tip to support reasonable suspicion, the tip must be accompanied by some corroborative elements that establish its reliability." (quotation marks omitted)); *cf. United States v. Massenburg*, 654 F.3d 480, 486 (4th Cir. 2011) ("Reliance on an anonymous tip may be reasonable where, suitably corroborated, [it] exhibits sufficient indicia of reliability." (quotation marks omitted)). Consequently, in my view, the district court erred in granting summary judgment on the basis of qualified immunity.

III.

The majority also maintains that Durham cannot establish a violation of a "clearly established" constitutional right. I dis-

agree and would hold that Durham's § 1983 malicious prosecution-type claim does meet this standard as a claim founded on the Fourth Amendment right to be free from unreasonable search and seizure. *See Lambert v. Williams*, 223 F.3d 257, 262 (4th Cir. 2000) (stating that incorporating the common law elements of malicious prosecution claim with the elements of a § 1983 claim was not the creation of a new cause of action, but was done "in recognition of the fact that § 1983 was designed to create a 'special species of tort liability.'" (quoting *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976))).

In this case, the parties do not contest that there is a clearly established, actionable right to freedom from prosecution without probable cause. Accordingly, it follows that Durham's § 1983 malicious prosecution-type claim, asserted under the Fourth Amendment, amounts to a "clearly established" right to be free from unreasonable seizure. *See id.* at 260.

### IV.

In sum, the majority holds that, since the grand jury indictment is conclusive evidence of probable cause, Durham is unable to establish the unreasonable seizure element of a viable § 1983 claim based on malicious prosecution. However, to the contrary, Durham's wrongful arrest and confinement may indeed meet the requirements of a § 1983 claim. Because there is a genuine dispute of fact as to whether Officer Horner's actions, which resulted in Durham's wrongful arrest and incarceration, were objectively reasonable, *Brooks*, 85 F.3d at 183-84, I respectfully dissent.